The following opinion is presented on-line for informational use only and does not replace the official version. (Mich Dept of Attorney General Web Site - www.ag.state.mi.us)

---

STATE OF MICHIGAN

MIKE COX, ATTORNEY GENERAL

| | |
|---|---|
| CONST 1963, ART 5, § 8: | The Governor's authority to direct the Department of Environmental Quality to impose certain requirements in the processing of applications for air emissions permits for coal-fired power plants |
| DEPARTMENT OF ENVIRONMENTAL QUALITY: | |
| EXECUTIVE DIRECTIVES: | |
| GOVERNOR: | |
| SEPARATION OF POWERS: | |

Executive Directive 2009-2(A) and (D), requiring the Michigan Department of Environmental Quality (DEQ) to determine whether there are more environmentally protective "feasible and prudent alternatives" to constructing a new coal-fired electricity generating plant when evaluating an air emissions permit application under Part 55 of the Natural Resources and Environmental Protection Act (NREPA), 1994 PA 451, MCL 324.5501 *et seq*, and further requiring the DEQ to deny a permit if such alternatives exist, impose requirements that are not found in Part 55 of the NREPA or the other provisions of law cited in the directive. Therefore, Executive Directive 2009-2(A) and (D) attempt to amend substantive law contrary to the separation of powers doctrine of Const 1963, art 3, § 2, and are unenforceable.

Executive Directive 2009-2(B) and (C), requiring the Michigan Department of Environmental Quality (DEQ) to make an initial "determination" regarding the "reasonable electricity generation need" of a proposed coal-fired electricity plant and then further requiring the DEQ to consider alternative methods of meeting that need, attempt to impose requirements not found in Part 55 of the Natural Resources and Environmental Protection Act, 1994 PA 451, MCL 324.5501 *et seq*, or the other provisions of law cited in the directive. Therefore, Executive Directive 2009-2(B) and (C) attempt to amend substantive law contrary to the separation of powers doctrine of Const 1963, art 3, § 2, and are unenforceable.

Although Executive Directive 2009-2 may constitute a formal expression of the Governor's environmental and energy policy preferences, it cannot and does not alter the existing regulatory requirements and procedures applicable to new coal-fired electricity generating plants under Part 55 of the Natural Resources and Environmental Protection Act, 1994 PA 451, MCL 324.5501 *et seq*.

Opinion No. 7224

February 20, 2009

| | |
|---|---|
| Honorable Kevin A. Elsenheimer<br>State Representative<br>The Capitol<br>Lansing, MI | Honorable Kenneth Horn<br>State Representative<br>The Capitol<br>Lansing, MI |

You have asked several questions concerning Executive Directive 2009-2 (ED 2009-2), issued February 3, 2009, and afforded immediate effect.[1] The directive instructs the Michigan Department of Environmental Quality (DEQ) to make specific determinations when processing applications for the air emissions permits necessary to construct new coal-fired power plants for generating electricity. These permits are issued under Part 55 of the Natural Resources and Environmental Protection Act (NREPA), 1994 PA 451, MCL 324.5501 to 324.5542.[2]

ED 2009-2 states, in part:

> A. Before issuing a permit to install under Part 55 of the [Natural] Resources and Environmental Protection Act, 1994 PA 451, MCL 324.5501 to 324.5542, for the construction of a new coal-fired electricity generating plant, the [DEQ] *shall determine whether there is a feasible and prudent alternative* consistent with the reasonable requirements of the public health, safety, and

welfare that would better protect the air, water, and other natural resources of this state from pollution than the proposed coal-fired electricity generating plant. [ED 2009-2(A); emphasis added.]

Before making that determination, however, the directive requires the DEQ to first make a determination that there is, in fact, a need for the electrical capacity of the coal-fired electricity plant:

> B. Before making the determination required by Paragraph A, the Department *shall first determine* whether a reasonable electricity generation need exists in this state that would be served by the proposed coal-fired electricity generating plant. If a reasonable electricity generation need exists in this state, the Department shall estimate the extent of the reasonable electricity generation need. [ED 2009-2(B); emphasis added.]

If the DEQ determines that there is a reasonable need for electricity generation, it must then consider alternative methods of meeting that need:

> C. The Department shall next consider alternative methods of meeting the reasonable electricity generation need, including, but not limited to, each of the following:
>
> > 1. Constructing new electricity generating resources that use technologies other than the burning of coal or that generate electricity from coal using technologies that reduce or sequester emissions.
> >
> > 2. Reducing electricity demand and peak demand through energy efficient programs or load management techniques.
> >
> > 3. Generating or purchasing electricity from existing electricity generating resources. [ED 2009-2(C).]

If, after following the requirements of paragraphs (A), (B), and (C), the DEQ determines that a more environmentally protective feasible and prudent alternative energy source exists, the DEQ must deny the applicant a permit:

> D. If the Department determines that a feasible and prudent alternative to the construction of a new proposed coal-fired electricity generating plant exists consistent with the reasonable requirements of the public health, safety, and welfare that would better protect the air, water, and other natural resources of this state than the proposed coal-fired electricity generating plant, *the Department shall not issue a permit to install*. [ED 2009-2(D); emphasis added.]

After reviewing the pertinent language of ED 2009-2, your first three questions regarding the directive may be rephrased and summarized as follows:

> When evaluating an air emissions permit application under Part 55 of the NREPA, may the DEQ be directed to:
>
> 1. Determine whether there are "feasible and prudent alternatives" to constructing the power plant and, if there are, deny the permit?
>
> 2. Determine whether there is a "reasonable need" for electricity generation in the State and, if so, consider alternative methods of meeting that need?

To answer these questions, it is necessary to review the purpose and legal effect of an executive directive. OAG, 2003-2004, No 7157, p 132 (June 2, 2004), is instructive regarding this issue. That opinion addressed questions regarding Executive Directives 2003-12 and 2003-13, relating to the Michigan Public Safety Communications System Act. One of the questions addressed was "whether the Governor has the authority to amend an existing substantive statute by executive directive consistent with the separation of powers doctrine of Const 1963, art 3, § 2." *Id*. p 137

The opinion noted that the Governor issued those executive directives, as she did here, pursuant to the Governor's power under Const 1963, art 5, § 8, which provides that: "[e]ach principal department shall be under the supervision of the governor unless otherwise provided by this constitution." *Id*. Acknowledging that the plain language of art 5, § 8 does not specifically mention executive directives, OAG No 7157 observed that executive directives "are not provided for as such in the constitution, but rather they have been used historically by governors as one means by which they exercise their supervisory authority" under art 5, § 8 "in the form of internal policy statements." *Id* .[3] The opinion continued by comparing executive *directives* with executive *orders*:

> In contrast to executive *directives*, executive *orders* are specifically provided for in Const 1963, art 5, § 2. This provision was new in the 1963 Constitution and was adopted to facilitate efficiency within the executive branch. *Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 745-746; 330 NW2d 346 (1982). The Governor, through the use of executive orders, may "make changes in the organization of the executive branch or in the assignment of functions among its units." Const 1963, art 5, § 2. Unless disapproved in each house of the Legislature, executive orders acquire the force and effect of law. For this reason, art 5, § 2 has been described as expressly vesting "legislative power" in the Governor without running afoul of Const

> 1963, art 3, § 2. *Soap & Detergent Ass'n, supra*, 415 Mich at 752; *House Speaker v Governor*, 443 Mich 560, 578; 506 NW2d 190 (1993). [*Id*. Emphasis in original; footnote omitted.]

Turning to the separation of powers doctrine, OAG No 7157 continued:

> Const 1963, art 3, § 2, provides for the separation of governmental powers, stating that "[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch *except as expressly provided by this constitution*." No provision of the constitution vests legislative power in the Governor with respect to executive directives. Accordingly, in the absence of a constitutional provision like art 5, § 2 expressly conferring legislative power on the Governor, executive directives cannot amend substantive law. [*Id*. Emphasis in original.]

Applying these principles to ED 2003-12 and ED 2003-13, OAG No 7157 analyzed the language of the two directives, observing that:

> ED 2003-12, as originally issued, used the mandatory "shall" in connection with allowing the installation of Agency equipment upon [Michigan Public Safety Communications System] towers, whereas MCL 28.283(2) uses the permissive "may." The Governor cannot, by executive directive under Const 1963, art 5, § 8, or by executive order under Const 1963, art 5, § 2, change substantive law that does not directly relate to the exercise of her *reorganization* authority. Changing a duty from one involving the exercise of discretion to one purporting to remove such discretion would change substantive law and exceed the Governor's authority. [*Id*. p 138. Citation omitted; emphasis in original.]

The opinion concluded, however, that because ED 2003-12 was superseded by ED 2002-13, and the latter no longer used the mandatory "shall," ED 2003-13 was consistent with MCL 28.281 to 28.283, and thus did not alter substantive law relating to the operation of the Michigan Public Safety Communications System Act:

> It is my opinion, therefore, in response to your second question, that an executive directive issued in the exercise of the Governor's supervisory authority under Const 1963, art 5, § 8, does not have the force and effect of law and cannot amend a state statute consistent with the separation of powers doctrine embodied in Const 1963, art 3, § 2. Executive Directive 2003-13 simply communicates internal policy and procedure regarding the operation of the Michigan Public Safety Communications System by the Director of the Michigan State Police "consistent with . . . MCL 28.281 to 28.283." It does not purport to amend or have the effect of amending a law and, accordingly, does not violate Const 1963, art 3, § 2. [*Id*.]

Returning to your first question, you ask whether the DEQ may be directed to determine whether there are "feasible and prudent alternatives" to constructing a coal-fired power plant within the context of the air emissions permit process under Part 55 of the NREPA and, if there are, be directed to deny the permit. This question focuses primarily on paragraphs (A) and (D) of ED 2009-2. Before an answer is provided, it is helpful to review the applicable permit process.

A new coal-fired power plant qualifies as a "major stationary source"[4] of air pollutants subject to the permit requirements of the federal Clean Air Act, 42 USC 7401 *et seq*, Part 55 of the NREPA, and other associated federal and state rules. The federal Clean Air Act is comprehensive legislation, divided into various subchapters and parts that address air pollution prevention and control.

The DEQ implements certain parts of the Clean Air Act under a delegation of authority from the US Environmental Protection Agency (EPA). When the DEQ exercises delegated federal authority in this way, it acts on behalf of the EPA in implementing that part of the Clean Air Act in Michigan.[5] The DEQ may also administer an "approved state program" with respect to certain other parts of the Clean Air Act. An approved state program is one whose requirements as set forth in its applicable state laws and regulations have been reviewed by the EPA and determined to be sufficiently equivalent to federal law so that the State's program may be applied by the State in place of the federal law.

Michigan's state program for permitting the construction of coal-fired power plants has been "conditionally approved" by the EPA.[6] The EPA has approved all the rules applied by the DEQ for permitting these facilities, Part 18 of Michigan's Air Pollution Control Rules, 2006 AACS, R 336.2801 *et seq*, with one exception not pertinent to the questions you have raised.[7] This office is advised that the DEQ is still acting as a delegated authority for purposes of permitting these facilities. But it is also applying the Part 18 rules that have been approved by the EPA as the equivalent of federal law.[8]

The approved Part 18 rules state, among other things, that a new major stationary source shall not be constructed without a permit requiring the source to apply best available control technology (BACT) for regulated air pollutants it has the potential to emit in significant amounts. 2006 AACS, R 336.2802(3) and 336.2810(2). BACT is defined as an emission limitation based on the maximum degree of reduction for each regulated air pollutant emitted from the proposed source in significant amounts "taking into account energy, environmental, and economic impacts and other costs." 2006 AACS, R 336.2801(f). Also relevant is Rule 1817 of Part 18, which states that the DEQ shall provide an opportunity for a public hearing so that interested persons may appear and submit comments "on the air quality impact of the major source, alternatives to it, the control technology required, and other appropriate considerations." 2006 AACS, R 336.2817(2)(e).[9]

As an administrative agency created by statute, the DEQ has no inherent powers and possesses only those powers that are expressly conferred by the state constitution or state statute or that are granted by necessary and fair implication to fully effectuate the express powers. *Pharmaceutical Research & Manufacturers of America v Dep't of Community Health*, 254 Mich App 397, 403-404; 657 NW2d 162 (2002). See also *Dep't of Public Health v Rivergate Manor*, 452 Mich 495, 503; 550 NW2d 515 (1996). A review of Part 55 of the NREPA and its corresponding rules reveals no provision either empowering the DEQ to make a "determination" within the air emissions permit process that there are "feasible and prudent alternatives" to constructing a proposed coal-fired power plant, or requiring the DEQ to then deny a permit based on a determination that such alternatives exist. Moreover, since the Governor has no authority to amend substantive law by executive directive, the Governor lacks the power to require the DEQ to expand or otherwise alter the permitting process established by the Legislature in Part 55 or to remove an agency's discretion conferred by law.

Because they set forth additional legal authorities that underlie the Executive Directive, it is next appropriate to examine the recitals, that is, the prefatory "whereas" clauses of ED 2009-2, to determine whether any of the statutory provisions identified there provide a legal basis not found in Part 55 for imposing the directives set forth in ED 2009-2.[10]

ED 2009-2 refers to Part 17 of the NREPA, MCL 324.1701-324.1706, the Michigan Environmental Protection Act (MEPA), and quotes section 1705(2), MCL 324.1705(2). The directive then observes that Part 17 "is supplemental to existing administrative and regulatory procedures provided by law." (ED 2009-2, Clause 7.)

But a plain reading of section 1705(2) does not provide the DEQ with the authority to make a determination of whether there are "feasible and prudent alternatives" to a proposed coal-fired power plant outside the context of a "proceeding" where particular conduct has been alleged and then determined to pollute, impair, or destroy, or to be likely to pollute, impair, or destroy, natural resources. Under section 1705(2), the evaluation of "feasible and prudent alternatives" does not arise until *after* the predicate allegation followed by a determination of "pollution, impairment, or destruction" of natural resources has been made. Section 1705(1) and (2) provide:

> (1) If administrative, licensing, or other proceedings and judicial review of such proceedings are available by law, the agency or the court may permit the attorney general or any other person to intervene as a party on the filing of a pleading asserting that the proceeding or action for judicial review involves conduct that has, or is likely to have, the effect of polluting, impairing, or destroying the air, water, or other natural resources or the public trust in these resources.
>
> (2) In administrative, licensing, or other proceedings, and in any judicial review of such a proceeding, the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources, shall be determined, and conduct shall not be authorized or approved that has or is likely to have such an effect if there is a *feasible and prudent alternative* consistent with the reasonable requirements of the public health, safety, and welfare. [MCL 324.1705(1) and (2); emphasis added.]

Moreover, the requirement that there be likely pollution, impairment, or destruction of natural resources before an evaluation of feasible and prudent alternatives is performed under section 1705(2) is supported by other provisions of the MEPA. For example, a plaintiff must make "a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources." MCL 324.1703(1). Thereafter, the defendant may "rebut the prima facie showing by the submission of evidence to the contrary," or the defendant may assert as an affirmative defense that there is "no feasible and prudent alternative to defendant's conduct." MCL 342.1703(1).

Thus, even assuming section 1705(2) applies to the air emissions permit process, as suggested by the reference in ED 2009-2, that section does not authorize the DEQ to determine whether there are "feasible and prudent alternatives" to a particular coal-fired power plant, until there has first been an allegation followed by an individualized determination that that plant will, or is likely to, pollute, impair, or destroy natural resources.

Another prefatory clause in ED 2009-2 broadly asserts that coal-fired plants emit "thousands of tons of air emissions . . . that threaten the air, water, and other natural resources of Michigan." (ED 2009-2, Clause 11.) It is reasonable to conclude that, recognizing MEPA's requirement as explained above, this statement was included in ED 2009-2 in an attempt to provide a blanket threshold determination that the construction of all new coal-fired power plants will pollute, impair, or destroy natural resources, thus permitting or requiring the DEQ to consider feasible and prudent alternatives to all such proposed plants. But the provision of Part 17 relied on by the executive directive contemplates that such a determination will be made in the context of "administrative, licensing, or other proceedings" where "the alleged pollution, impairment, or destruction" is at issue. This clearly contemplates an individualized determination in a proceeding concerning specific conduct. The assertion stated in Clause 11 of ED 2009-2 does not constitute such a determination.

ED 2009-2 also cites section 165(a)(2) of the federal Clean Air Act, 42 USC 7475(a)(2), as providing the DEQ with "the discretion to consider alternatives to proposed sources of air emissions." (ED 2009-2, Clause 10.)[11] The DEQ's approved Part 18 rules contain a rule with language similar to section 165(a)(2).[12] Rule 1817 governs public participation in the permit process by providing an opportunity for interested persons to submit comments and be heard at a public hearing. After receiving a "technically complete" application, Rule 1817(2), R 336.2817(2), requires the DEQ to do a number of things, including:

(c) Notify the public, by advertisement in a newspaper of general circulation in each region in which the proposed major source would be constructed, of the application, the preliminary determination [regarding the application], the degree of increment consumption that is expected from the major source or major modification, and of the opportunity for comment at a public hearing as well as written public comment.

* * *

(e) Provide opportunity for a public hearing for interested persons to appear and submit written or oral comments on the air quality impact of the major source, alternatives to it, the control technology required, and other appropriate considerations. [R 336.2817(2)(c) and (e).]

By their terms,[13] Rule 1817(2)(c) and (e) require the DEQ to provide public notice and the opportunity for comment by interested persons on, among other things, "alternatives to [the power plant]." Rule 1817(2)(f) and (g) require the DEQ to:

(f) Consider all written comments submitted within a time specified in the notice of public comment and all comments received at any public hearing in making a final decision on the approvability of the application. The department shall make all comments available for public inspection in the same locations where the department made available preconstruction information relating to the proposed major source or major modification.

(g) Make a final determination whether construction should be approved, approved with conditions, or disapproved.

Subsections (f) and (g) require the DEQ to consider the oral or written comments received at the public hearing, and make a final determination with respect to the application after doing so.

These four pertinent subsections require the DEQ to hold a public hearing at which interested persons may submit oral or written comments, which the DEQ must consider in making a final determination regarding the application. Rule 1817 provides no authority for a blanket mandate requiring the DEQ to determine whether there are more environmentally protective feasible and prudent alternatives to the construction of a proposed coal-fired plant, and, if there are, to deny the permit.

Finally, it is important to recall that ED 2009-2 states that section 165(a)(2) [42 USC 7475(a)(2)] provides the DEQ with "*the discretion* to consider alternatives to proposed sources of emissions." (Emphasis added.) It is acknowledged that the EPA's Environmental Appeals Board (EAB) – an administrative body that reviews certain EPA decisions – has interpreted section 165(a)(2) as authorizing the EPA, in its discretion, to also consider alternatives not identified in public comment, and to require that an applicant actually pursue alternatives the EPA deems viable or risk denial of a permit. See *In re Prairie State Generating Co*, PSD Appeal No. 05-05, slip op. at 38-40 (EAB, Aug. 24, 2006). Irrespective of whether that decision is supported by the language of section 165(a)(2) or not, the EAB's decisions are not binding beyond the parties to the appeal before it. Moreover, as the directive itself recognizes, the authority under section 165(a)(2) to analyze and impose alternatives is discretionary not mandatory. As such, even assuming the EAB's interpretation of section 165(a)(2) were binding on the DEQ, the Governor cannot make mandatory, as ED 2009-2 does, that which the applicable law makes discretionary. OAG No 7157, p 138.

It is my opinion, therefore, in answer to your first question, that Executive Directive 2009-2(A) and (D), requiring the Michigan Department of Environmental Quality (DEQ) to determine whether there are more environmentally protective "feasible and prudent alternatives" to constructing a new coal-fired electricity generating plant when evaluating an air emissions permit application under Part 55 of the Natural Resources and Environmental Protection Act (NREPA), 1994 PA 451, MCL 324.5501 et seq, and further requiring the DEQ to deny a permit if such alternatives exist, impose requirements that are not found in Part 55 of the NREPA or the other provisions of law cited in the directive. Therefore, Executive Directive 2009-2(A) and (D) attempt to amend substantive law contrary to the separation of powers doctrine of Const 1963, art 3, § 2, and are unenforceable.

Before addressing your second question – whether the DEQ may be directed to determine if there is a "reasonable need" for electricity generation in the State, the extent of that need, and, if there is such need, to consider "alternative methods" for meeting that need – further review of ED 2009-2 is required. Your second question primarily focuses on paragraphs (B) and (C) of the directive.

Paragraphs (B) and (C) of ED 2009-2, which require the DEQ to engage in a "need and alternative methods" analysis, operate in relation to paragraphs (A) and (D), which require the "feasible and prudent alternatives" analysis described above. It is presumed that the directive intends the "need and alternative methods analysis" to operate in conjunction with the "feasible and prudent alternatives" analysis as a cohesive whole, such that a finding of the existence of a feasible and prudent alternative will provide a basis for a denial under paragraph (D). In other words, a logical reading of these operative provisions indicates that, if the DEQ were to make a determination under paragraph (B) that *no* "reasonable electricity generation need exists in this state that would be served by the proposed coal-fired electricity generating plant," the DEQ's "feasible and prudent alternative" determination under paragraph (A) would be that a "no-build" alternative would better protect the natural resources, thus requiring the permit to be denied under paragraph (D). Similarly, if the DEQ makes a determination under paragraph (B) that there *is* a "reasonable electricity generation need," and upon considering the "alternative methods" set forth in paragraph (C) regarding electricity generation,[14] thereafter finds

one of those methods or some other method more favorable, the DEQ must determine for purposes of paragraph (A) that another "feasible and prudent alternative" to the coal-fired plant exists, and must, accordingly, refuse to issue a permit under paragraph (D). Under either circumstance, ED 2009-2 directs the DEQ to deny an air emissions permit to a proposed coal-fired power plant.

Because the "need and alternative methods analysis" can only logically be read as part of a cohesive whole that operates in conjunction with the "feasible and prudent alternatives analysis" required in the directive, the analysis already provided in response to your first question also answers this question.

First, to the extent the DEQ is being directed to undertake the "need and alternative methods analysis" under the broader umbrella of the "feasible and prudent alternatives analysis" the directive contemplates under section 1705(2) of the MEPA, the DEQ lacks the authority to engage in such an analysis. As explained earlier, section 1705(2) does not authorize the DEQ to proceed directly to determining whether there are "feasible and prudent alternatives" to construction of a coal-fired power plant, and deny a permit if there are more environmentally protective alternatives, without first determining, based on specific conduct "alleged" in a "proceeding," that the power plant will or is likely to "pollute, impair or destroy natural resources."

Second, the previous analysis of Part 55, its rules, and the other statutory provisions relied on in the directive, reveals no express or reasonably implied grant of statutory authority by the Legislature to the DEQ that would require the DEQ to make a determination regarding the need for electricity generation in this State, and alternative methods for meeting that need, within the context of deciding whether to grant or deny an air emissions permit.[15] Section 165(a)(2) of the Clean Air Act and R 336.2817(2) only expressly require the opportunity for and consideration of comment by interested persons. Nothing in those provisions can be read to require the DEQ to consider and make determinations regarding the specific alternatives listed in the directive.

To the extent ED 2009-2(B) and (C) impose a sequence of specific factors that must be considered before the DEQ may issue an air emissions permit under Part 55, particularly where the application of the factors may form the basis for denying a permit, ED 2009-2 attempts to amend substantive law and, therefore, for the reasons explained above, violates the separation of powers doctrine in Const 1963, art 3, § 2.

It is my opinion, therefore, in answer to your second question, that Executive Directive 2009-2(B) and (C), requiring the Michigan Department of Environmental Quality (DEQ) to make an initial "determination" regarding the "reasonable electricity generation need" of a proposed coal-fired electricity plant and then further requiring the DEQ to consider alternative methods of meeting that need, attempt to impose requirements not found in Part 55 of the Natural Resources and Environmental Protection Act, 1994 PA 451, MCL 324.5501 *et seq*, or the other provisions of law cited in the directive. Therefore, Executive Directive 2009-2(B) and (C) attempt to amend substantive law contrary to the separation of powers doctrine of Const 1963, art 3, § 2, and are unenforceable.

Your final question asks what legal effect should be accorded to ED 2009-2 based upon the answers to your first three questions. Executive Directives cannot alter substantive law. See OAG No 7157, p 138.[16]

It is my opinion, therefore, in answer to your final question, that, although Executive Directive 2009-2 may constitute a formal expression of the Governor's environmental and energy policy preferences, it cannot and does not alter the existing regulatory requirements and procedures applicable to new coal-fired electricity generating plants under Part 55 of the Natural Resources and Environmental Protection Act, 1994 PA 451, MCL 324.5501 *et seq*.

MIKE COX
Attorney General


[1] This opinion addresses only the legality of Executive Directive 2009-2. It does not address the desirability of the purposes sought to be achieved by the directive.

[2] As explained below, air emissions permitting involves both state and federal law.

[3] See also *Hendrickson v Wilson*, 374 F Supp 865, 876 (WD Mich, 1973), and <http://www.michigan.gov/gov/0,1607,7-168-36898---,00.html> (accessed February 17, 2009).

[4] See 40 CFR 52.21(b)(1)(i) and 2006 AACS, R 336.2801(cc).

[5] Even under a delegation, the DEQ still implements applicable state law.

[6] See, 73 Fed Reg 53366 (September 16, 2008). Once fully approved, the DEQ's program would implement Subchapter I, Part C of the Clean Air Act, "Prevention of Significant Deterioration of Air Quality," 42 USC 7470-7492.

[7] The EPA required the DEQ to address deficiencies in R 336.2816, which address impacts to Class I areas (designated areas with higher air quality standards). 73 Fed Reg 53366 (September 16, 2008).

[8] See <http://www.michigan.gov/documents/deq/DEQ-AQD-toxics-CoalFired_Power_Plants_info_242997_7.pdf > (accessed February 19, 2009), and click on links for Permit Applications.

[9] Presently, there are five proposed coal-fired power plants in Michigan involved in the permitting process. The DEQ's website contains "Fact Sheets" for two of the proposed coal-fired power plants (Wolverine Power Supply Cooperative, Inc and the Holland Board of Public Works). These provide an outline of the various permitting requirements and the permitting process. See <http://www.deq.state.mi.us/aps/cwerp.shtml#WPSCU> (accessed February 17, 2009), and click on the links for the Fact Sheet - View.

[10] ED 2009-2 cites Const 1963, art 4, §§ 51 and 52, which respectively declare the public health and general welfare of the people, and the conservation and development of the natural resources of this State, to be of primary or paramount public concern. Article 4 is the article relating to the legislative branch. Article 4, § 51 mandates that the Legislature shall pass suitable laws for the protection and promotion of the public health, and § 52 requires the Legislature to provide for the protection of the air, water, and other natural resources of the State from pollution, impairment, and destruction. These provisions are a mandate for legislative action and do not, by their terms, confer any independent authority on the Governor.

[11] 42 USC 7475(a)(2) provides:

> (a) Major emitting facilities on which construction is commenced. No major emitting facility on which construction is commenced after the date of the enactment of this part [enacted Aug. 7, 1977], may be constructed in any area to which this part [42 USCS §§ 7470 *et seq*] applies unless--
>
> * * *
>
> (2) the proposed permit has been subject to a review in accordance with this section, the required analysis has been conducted in accordance with regulations promulgated by the Administrator, and a public hearing has been held with opportunity for interested persons including representatives of the Administrator to appear and submit written or oral presentations on the air quality impact of such source, alternatives thereto, control technology requirements, and other appropriate considerations.

[12] 42 USC 7475(a)(2), unlike Rule 1817, expressly provides for "representatives of the [agency director]" to submit comments and alternatives.

[13] In construing administrative rules, courts apply rules of statutory construction. *Detroit Base Coalition for the Human Rights of the Handicapped v Dep't of Social Services*, 431 Mich 172, 185; 428 NW2d 335 (1988). If the plain and ordinary meaning of the language used in the rule is clear, it must be enforced as written, and nothing may be read into the rule that is not present in the text as written. See *Halloran v Bhan*, 470 Mich 572, 576-578; 683 NW2d 129 (2004).

[14] To the extent that ED 2009-2(C) does not limit the type or number of alternative methods that may be considered by the DEQ, that aspect is not important to the analysis presented in this opinion.

[15] It is also worth noting that ED 2009-2(B) assigns certain duties to the DEQ that are presently assigned to the Michigan Public Service Commission. With respect to the requirement in paragraph (B) that the DEQ make a determination regarding the "reasonable electricity generation need" to be served by a proposed plant, the directive further states that "[t]he Michigan Public Service Commission shall provide technical assistance to the [DEQ] in making determinations required by this Directive." (ED 2009-2(E)). ED 2009-2 does not itself define "reasonable electricity generation need" or refer to any statute that either utilizes or defines the term. But the Legislature has established a statutory mechanism for utilities regulated by the Commission to seek a determination of the "need" for an electricity generating facility before construction under section 6s of the Michigan Public Service Commission Act, MCL 460.6s. That statute requires the Commission to consider need in the context of an application for a certificate of necessity under MCL 460.6s(3)(a) and (b).

[16] Additionally, if, as a matter of the DEQ policy, ED 2009-2 were followed as written, and the air emissions permitting process under Part 55 were altered such that the DEQ, in every case, made a formal "determination" whether an energy need existed in this State that would be served by the proposed coal-fired plant and whether a feasible and prudent alternative to the proposed new construction existed where need was found, a further concern might be raised concerning whether this constituted "an agency regulation, statement,

standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency" thus falling within the definition of a "rule" that must be promulgated under the procedures set forth in the Michigan Administrative Procedures Act, MCL 24.201 *et seq*. See MCL 24.207 (definition of a "rule") and MCL 24.231-24.264 (describing the process for processing and publishing rules).

---

http://opinion/datafiles/2000s/op10301.htm
**State of Michigan, Department of Attorney General**
Last Updated 10/15/2009 15:03:08